24345

Marshall B. WILLIAMS, President Pro Tempore of the South Carolina Senate, on behalf of the Senate, Petitioner v. Earle E. MORRIS, Jr., Comptroller General, and David M. Beasley, Governor, State of South Carolina, Respondents.

(464 S.E. (2d) 97)

Supreme Court

*Michael N. Couick, W. Hogan Brown, Paula G. Benson,* Columbia, *for Petitioner.*

*Nathan Kaminski, Jr., Senior Assistant Attorney General,* Columbia, *for Respondent.*

*Harold W. Jacobs* and *David C. Eckstrom,* both of *Nexsen, Pruet, Jacobs & Pollard, L.L.P.,* Columbia, *for Respondent Governor Beasley.*

Heard, Sept. 14, 1995.

Decided Nov. 6, 1995.

*Per Curiam:*

In this action brought under this Court's original jurisdiction, Petitioner Senator Marshall B. Williams, President *Pro Tempore* of the Senate (the Senator), acting on behalf of the South Carolina Senate (the Senate), asks this Court to declare that because the General Assembly's *sine die* adjournment prevented return of the 1995-96 General Appropriations Act (the act) within five days, Governor David M. Beasley (the Governor) lacks the power to exercise his line-item veto until the General Assembly reconvenes. Accordingly, the Petitioner seeks a ruling that the Governor's line-item vetoes of the 1995-96 General Appropriations Act are ineffective and that, therefore, the Act as passed by the General Assembly is fully effective.

## BACKGROUND

On June 13, 1995, the General Assembly passed the 1995-

1996 General Appropriations Act (the Act) and then adjourned *sine die*. The Act specifies that it is to take effect "immediately upon its approval by the Governor." [H. 3362; R. 211, p. II-111]

On June 29, 1995, the Governor stated his objections to one-hundred three items in the Act, but voiced no objections to the other appropriations in the Act. One of the items to which the Governor objected was a $5,600 appropriation for certain interim expenses borne by the Senate. When the Senator submitted a voucher to the Comptroller General's Office for interim expenses of $5,600 appropriation for certain interim expenses borne by the Senate. When the Senator submitted a voucher to the Comptroller General's Officer for interim expenses of $5,600, the Comptroller General refused to process Petitioner's voucher or disburse the allocated funds.

In response to the refusal by the Comptroller General's Officer to disburse the allocated funds, the Senator initiated this action against Comptroller General Earle E. Morris, Jr. (Comptroller General.) We granted the Governor's request to intervene as a Respondent.

## ANALYSIS

S.C. Const. art. IV, § 21, cl. 3 provides: If a bill or joint resolution shall not be returned by the Governor within five days after it shall have been presented to him Sunday's excepted, it shall have the same force and effect as if he had signed it, unless the General Assembly, by adjournment, prevents return, in which case it shall have such force and effect unless returned within two days after the next meeting.

The Senator contends the plain meaning of this clause mandates that when the General Assembly passes a bill and then adjourns *sine die* before the expiration of the five-day period ordinarily provided the Governor, the bill is effective at least until the General Assembly reconvenes, at which time the Governor may exercise his veto power. The Governor, on the other hand, argues that clause 3 of section 21 simply sets the time during which the Governor may consider a bill when the General Assembly has adjourned and that, unless approved by the Governor, a bill is ineffective during the interim.

Although there is some merit to both positions, we believe the view advanced by the Governor better accords with reason, law, and longstanding practice in the State of South Carolina. Accordingly, we find in favor of Respondents, the Governor and the Comptroller General.

A. *Reason*

If this Court adopts the interpretation of section 21 of Article IV proposed by the Senator, the practical effect of such an interpretation will be to render the Governor's veto power a nullity under certain circumstances. The present situation provides an excellent illustration: Here, the General Assembly appropriated $5,600 for itself for "interim expenses," which money presumably would be spent during the interim. If the Constitution is read to require that this appropriation is valid throughout the interim and can be vetoed only after the General Assembly reconvenes, then any veto of the expenditure by the Governor is in name only. After all, once the Governor is able to veto the expenditure, *the money already will have been spent.*

Of course, under limited circumstances, a contrary construction also can lead to an unpalatable result: If the Governor is able during the interim to veto appropriations that were to be disbursed and used during the interim, then the General Assembly cannot exercise its constitutional power to override the gubernatorial veto until it reconvenes. By the time it reconvenes, however, the damage will have been done, because needed monies will not have been disbursed.

We note, however, that as a practical matter, the General Assembly can avoid such a situation by passing bills more than five days before it adjourns, thus creating a situation in which the Governor *must* act before adjournment. Once the Governor returns the bill, the General Assembly can immediately takes steps to override the veto.[1]

Moreover, in order to accept the Petitioner's interpretation,

---

[1] We realize, of course, that it may not always be possible for the General Assembly to pass bills more than five days prior to adjournment. However, the General Assembly is in a better position than the Governor to prevent situations in which the exercise of either the veto power or the override power will be futile because of actions taken between sessions of the General Assembly. This is particularly so since the Governor has no role in setting the time for *sine die* adjournment.

one also must accept the proposition that the drafters of the 1895 Constitution intended in clause 3 of section 21 to give the Governor *less* power in the legislative process than he ordinarily possesses under the Constitution and to give the General Assembly an effective means for circumventing the requirement of gubernatorial approval of legislation. We do not believe the language of section 21 supports such a proposition.

In our view, the drafters' interest in section 21 simply was to prescribe two ways in which a bill may become law without the Governor's signature: First, if the Governor does not return the bill with objections within five days, it becomes law automatically, provided the General Assembly still is in session on the fifth day. However, when the legislature is not still in session on the fifth day, then if the Governor does not return the bill with objections within the new time period which extends to the second day after the General Assembly's next meeting, the bill becomes law automatically.

In other words, Clause 3 sets out the way a bill may become law by lapse of time when the Governor takes no action. The interim period after adjournment is analogous to the five-day period ordinarily provided when the General Assembly remains in session: The Governor has this time to consider the bill, and the bill does not become law during the interim unless the Governor signs his approval. If the Governor returns any objections he has to the bill within two days after the next meeting of the General Assembly, the bill does not become law until the General Assembly has an opportunity to consider and override the gubernatorial veto.

## B. *Law*

There are no opinions by this Court addressing the precise issue raised in this lawsuit. Nevertheless, there is persuasive authority from the state of Maine, which has a constitutional provision very similar to art. IV, § 21 of the South Carolina Constitution. In *Opinion of the Justices*, 437 A. (2d) 597 (Me. 1981), the Maine Supreme Court construed article IV, pt. 3, § 2 of the Maine Constitution. That section provides:

> If the bill or resolution shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, it shall have the same force and effect, as if he had signed it unless the Legislature by

their adjournment prevent its return, in which case it shall have such force and effect, unless returned within three days after the next meeting of the same Legislature which enacted the bill or resolution; if there is no such next meeting of the Legislature which enacted the bill or resolution, the bill or resolution shall not be a law.

The Maine Supreme Court found that this constitutional provision generally prevents bills from becoming law during interims:

We conclude that L.D.1594 [a bill], although presented to the Governor on June 19, 1981, is still awaiting his action in signing or vetoing it. Ordinarily, L.D.1594 would have become law when not acted upon by the Governor within ten days. However, the adjournment of the Legislature tolled that period, and the Governor has until three days after the next meeting of the 110th Legislature to act on the bill. . . . L.D.1594 has therefore not yet become law. . . .

*Opinion of the Justices*, 437 A. (2d) at 604. Later, in another case concerning the same constitutional language, the Maine Supreme Court once again reiterated that a law does not automatically become effective during the interim. *See Opinion of the Justices*, 484 A. (2d) 999, 1000-01 (Me. 1984); *see also Hartness v. Black*, 95 Vt. 190, 114 A. 44, 48 (1921) (finding that clause in Vermont Constitution similar to clause at issue here was "a concession in favor of the executive, and not a limitation of his power of approval"); 82 C.J.S. *Statutes* § 50 (1953) ("A provision in the constitution that a bill shall not become a law if the return is prevented by adjournment after presentment has been held to be merely a qualification of the provision making bills become law by laps of time, and not to interfere with the right of the governor to give his express approval to bills after adjournment.").

In addition to the legal authorities from other jurisdictions, there are three opinions of the South Carolina Attorney General dispositive of this very issue. *See* 1992 Op. A.G. 92-33; 1982 Op. A.G. 82-42; and 1911 Op. A.G. 58. In 1992 Op. A.G. 92-33, Governor Carroll Campbell presented the following question to Attorney General Travis Medlock:

What is the effect of a bill vetoed after *sine die* and after the five-day period had expired (but before the two-day period into the next Session)?

Citing the 1982 opinion by Attorney General Daniel McLeod, the Office of Attorney General Medlock concluded that "a bill [that] cannot be reconsidered by each House because the General Assembly adjourned before the Governor 'returned' the bill, remains *ineffective* until the 'next session' when [the Governor' has two days to return it [unless the Governor approves the bill during the interim]." 1992 Op. A.G. 92-93, at 82 (quoting 1982 Op. A.G. 82-42 (emphasis in original). Attorney General Medlock based this conclusion on the 1982 and 1911 Attorney General opinions, longstanding practice in South Carolina, other South Carolina case law, and its own interpretation of the language in section 21. *Id.* at 82-83. Applying this holding to the General Appropriations Bill, the Office of Attorney General Medlock found the following:

> With respect to the Appropriations Act, such items as are not vetoed, are approved pursuant to Article IV, Section 21. If the Governor vetoes items in the Appropriations Act following *sine die* adjournment, such vetoes are valid, and remain valid, so long as returned to the General Assembly within two days of the next meeting and are not overridden in the manner prescribed in Article IV, Section 21.

*Id.* at 86.

The Senator argues that the 1982 and 1992 Attorney General opinions relied upon by the Governor are based upon a fundamental misinterpretation of various opinions by this Court and on inapposite opinions from our sister states. Although we agree with the Senator that some of the foreign opinions relied on by Attorneys General McLeod and Medlock are inapposite because South Carolina's Constitution differs significantly from those of other states, we believe the opinions of the Attorneys General are fundamentally sound. They are rooted in reason, longstanding practice, and sound interpretation of the language of the South Carolina Constitution. There are no cogent reasons for this Court to disregard these opinions.

Finally, there is evidence that a committee of the General Assembly itself has considered the import of clause 3 and concluded that under 1895 Constitution, a bill is not automatically effective during the interim if the Governor takes no action to approve it. *See Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895* (1969) (known as West Committee Report) ("Under [clause 3], it is possible for considerable time to elapse between the adjournment of the General Assembly and its next meeting, during which time the fate of any number of bills might not be finally known. . . . [S]ome consideration might be given to placing in the Constitution a time limit on the period in which a Governor may consider a bill after the Legislature adjourns before it becomes law.").

C. *Longstanding Practice*

As the Governor notes in his brief, the historical evidence in this case is overwhelming. Indeed, the Governor's exhaustive analysis of all available historical evidence compels the following conclusions:

- Since the ratification of the 1895 Constitution, the uniform belief of South Carolina's governors has been that a bill they have declined to sign after *sine die* adjournment does not have the force and effect of law until it is signed, and a bill vetoed in the interim lacks the force and effect of law without a veto override.[2]

---

[2] For example, in a letter dated January 9, 1912 to the 1912 House of Representatives, Governor Cole Blease explained his decision to approve without signature a bill passed on the next to last day of the prior session stating: "I have decided to allow this act to become law without my signature to the same." [1912 Journal of the House of Representatives, January 9, 1912, p. 21].

Governor Thomas G. McLeod returned S. 124, H. 467 of 1925, which the General Assembly had ratified on the last day of the 1925 session, to the Senate on the first day of the 1926 legislative session. [1926 Journal of the Senate, January 12, 1926, p. 12]. He wrote in his veto message that "[i]f this bill should become law, it would mean necessarily hampering the administration of the taxes and therefore cause loss thereof." [*Supra*, p. 13]. Clearly, Governor McLeod did not view the unsigned bill as law.

In 1949, Governor Strom Thurmond vetoed S. 563, an act authorizing the board of township commissioners for Sullivan's Island to buy Fort Moultrie from the United States Government. [1949 Senate Journal, January 11, 1949, p. 23]. In his veto message, Governor, Thurmond stated: "This Act was to be held by me and signed only should it prove to be necessary between sessions to protect the public interest." [*Supra*, p. 24]. The implication of this statement is apparent: Governor Thurmond believed his signature would have

• Code Commissioners, who are required by law to determine when a law is "of force," have consistently held the view that an act placed in the hands of the governor within five days (formerly three days) of *sine die* adjournment becomes effective only when signed by the

been required between sessions in order for the legislation to be effective during the interim.

More recently, Governor Carroll Campbell referred to legislation that he did not sign during an interim as "proposed legislation." [1989 Journal of the House of Representatives, January 12, 1989, p. 174]. He did not view the legislation as effective during the interim.

For further examples of the views of former South Carolina governors concerning this issue, see Brief of Respondent Governor Beasley at 8-15.

Furthermore, since 1895, South Carolina's governors have signed legislation after *sine die* adjournment by the General Assembly but before the General Assembly has reconvened. These signatures during the interim would not be necessary if the legislation were effective during the interim even *without* gubernatorial approval. *See, e.g.,* 1896 S.C. Acts 387 (approved by Governor John Gary Evans of March 9, 1896 after *sine die* adjournment on March 7, 1896); 1899 S.C. Acts 53 (approved by Governor William H. Ellerbe on March 3, 1899 after *sine die* adjournment on February 21, 1899); 1902 S.C. Acts 1220 (approved by Governor M.B. McSweeney on February 26, 1902 after *sine die* adjournment on February 22, 1902); 1906 S.C. Acts 359 (approved by Governor D.C. Heyward on February 24, 1906 after *sine die* adjournment on February 17, 1906); 1909 S.C. Acts 419 (approved by Governor M.F. Ansel on March 1, 1909 after *sine die* adjournment on February 27, 1909); 1914 S.C. Acts 543 (approved by Governor Cole L. Blease on March 5, 1914 after *sine die* adjournment on March 4, 1914); 1918 S.C. Acts 1112 (approved by Governor Richard I. Manning on February 16, 1918 after *sine die* adjournment on February 12, 1918); 1920 S.C. Acts 1675 (approved by Governor Robert A. Cooper on March 11, 1920 after *sine die* adjournment on March 6, 1920); 1926 S.C Acts 1617 (approved by Governor Thomas G. McLeod on March 23, 1926 after *sine die* adjournment on March 20, 1926); 1929 S.C. Acts 1052 (approved by Governor John G. Richards on April 27, 1929 after *sine die* adjournment on March 16, 1929); 1932 S.C. Acts 2117 (approved by Governor Ibra C. Blackwood on May 14, 1932 after *sine die* adjournment on April 9, 1932); 1936 S.C. Acts 1635 (approved by Governor Olin D. Johnson on June 11, 1936 after *sine die* adjournment on June 6, 1936); 1942 S.C. Acts 1463 (approved by Governor Burnet R. Maybank on October 18, 1941 after *sine die* adjournment on May 14, 1941); 1943 S.C. Acts 1 (approved by Governor R.M. Jefferies on September 26, 1942 after *sine die* adjournment on March 12, 1942); 1952 S.C. Acts 1688 (approved by Governor J. Strom Thurmond on December 28, 1951 after *sine die* adjournment on May 4, 1951); 1955 S.C. Acts 1 (approved by Governor James F. Byrnes on January 10, 1955 after *sine die* adjournment on April 2, 1954); 1959 S.C. Acts 1 (approved by Governor George Bell Timmerman on May 15, 1958 after *sine die* adjournment on April 24, 1958); 1962 S.C. Acts 2522 (approved by Governor Ernest F. Hollings on June 12, 1961 after *sine die* adjournment on May 18, 1961); 1967 S.C. Acts 2 (approved by Governor Donald Russell on August 24, 1966 after *sine die* adjournment on May 20, 1966; 1970 S.C. Acts 1883 (approved by Governor Robert E. McNair on August 25, 1969 after *sine die* adjournment on July 17,

Governor or, if unsigned, on the second day after the next meeting of the General Assembly.[3]

- The General Assembly itself has expressed a belief that bills do not automatically become law simply because the Legislature adjourned *sine die* before the Governor had an opportunity to sign or return his objections to the bills to the General Assembly.[4]

Both this Court and the United States Supreme Court have found that courts should accord weight to past practices and legislative interpretations. *See Okanogan, Methow Tribes v. United States,* 279 U.S. 655, 678, 49 S.Ct. 463, 466, 73 L.Ed. 894, 902 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."); *Powers v. State Educational Finance Comm'n,* 222 S.C. 433, 73 S.E. (2d) 456

---

1969); 1975 S.C. Acts 974 (approved by Governor John C. West on September 23, 1974 after *sine die* adjournment on August 22, 1974); 1977 S.C. Acts 2 (approved by Governor James B. Edwards on October 11, 1976 after *sine die* adjournment on July 22, 1976); 1987 S.C. Acts 2312 (approved by Governor James B. Edwards on October 11, 1976 after *sine die* adjournment on July 22, 1976); 1987 S.C. Acts 2312 (approved by Governor Richard W. Riley on June 30, 1987 after *sine die* adjournment on June 25, 1987); 1993 S.C. Acts 3 (approved by Governor Carroll A. Campbell, Jr. on December 11, 1992 after *sine die* adjournment on June 4, 1992).

For further examples of such action, see Appendix B in Brief of Respondent Governor Beasley.

Finally, in the past, South Carolina governors have delivered vetoes after *sine die* adjournment and before the beginning of the next legislative session. For example, on June 24, 1986, Governor Riley vetoed R627, S1375 [1987 Journal of the Senate, Jan. 20, 1987, p. 217], which the General Assembly had passed before it adjourned *sine die* June 19, 1986. [*See* 1986 S.C. Acts p. iv]. The General Assembly did not reconvene until January 13, 1987. [*See* 1987 S.C. Acts p. 1]. Appendix A of the Brief of Respondent Governor Beasley contains examples of several such vetoes.

[3] *See, e.g.,* Code Commissioner William Elliott, Jr.'s Note preceding 1903 Statutes at Large: "The Governor still has, at the time of publication of the Acts for 1903, the Act entitled 'An Act to empower towns or cities of five thousand inhabitants and over to subscribe to the maintenance of public libraries' and is therefore not published." [XXIV *Statutes of South Carolina* p. xx]. Had the Code Commissioner considered the Act effective, he would have published it. *See also, e.g.,* Code Commissioner Andrew J. Bethea's Note preceding Acts and Joint Resolution for the 1914 Extraordinary Session of the General Assembly. [XXIX *Statutes of South Carolina* unnumbered page following p. vi]; Code Commissioner Thomas S. Linton's Notice preceding 1988 A.C. Acts and Joint Resolutions [1988 S.C. Acts p. v]. For several other such examples, See Brief of Respondent Governor Beasley at 17-22.

[4] *See* discussion of West Committee Report *supra,* Part B.

(1952). In the present case, there can be no question that the scales of history tip overwhelmingly in favor of the Governor's proposed interpretation of the South Carolina Constitution.

## CONCLUSION

In sum, we conclude that law, reason, and longstanding ▮ past practice require us to reject the Petitioner's challenge to the Governor's veto. We note that our interpretation of section 21 does not alter or reduce the General Assembly's central role in the legislative process, nor does it ignore the general rule that the grant of veto power to the Governor must be strictly construed. *See, e.g., Colorado General Assembly v. Lamm*, 704 P. (2d) 1371, 1386 (Colo. 1985) ("[T]he veto power can be exercised only when clearly authorized by the constitution and language conferring it is to be strictly construed."). Although the grant of veto power to the Governor must be strictly construed, we cannot ignore the obvious: The South Carolina Constitution vests the Governor with veto power, and the interpretation proposed by the Petitioner would deny such power entirely under certain circumstances. To construe strictly a constitutional grant of power *cannot* mean to ignore that a grant was made. The Constitution clearly envisions gubernatorial participation in the legislative process, and we decline to "construe" that participation out of the process. Our decision does not reduce the General Assembly's power in any way that the South Carolina Constitution has not already reduced it by requiring the Governor's participation in enacting statutes. Accordingly, we dismiss this action and hold that the vetoes exercised by the Governor are fully effective.