*909 PER CURIAM:
**317 Petitioner the Senate of the State of South Carolina, by and through its President Pro Tempore, the Honorable Hugh K. Leatherman Sr. (the Senate) initiated this action in the original jurisdiction of this Court pursuant to Rule 245, SCACR. The Senate asks this Court to declare invalid Respondent Governor Henry D. McMaster's (Governor McMaster or Governor) recess appointment[1] of Respondent Charles M. Condon (Condon) to the office of Chairman of the Board of Directors for the Public Service Authority (the Board), pursuant to section 1-3-210 of the South Carolina Code (2005).
In reaching the conclusions set forth in this opinion, we have not concerned ourselves with the reasons why a branch of government, whether it be the Legislative or the Executive, chooses to act or not act in any given circumstance. Such considerations are inherently political in nature and we have no designs upon intruding into those areas. Our role is to rule upon this controversy with requisite restraint, with a keen eye focused upon our one and only responsibility-to interpret section 1-3-210 in accordance with our rules of statutory construction. Both the Senate and Governor McMaster contend the plain language of this statute unambiguously supports their respective positions. We conclude the pertinent provisions of the statute are ambiguous. We hold Governor McMaster's appointment of Condon during the 2018 recess was valid.
I.
In this declaratory judgment action, the Senate challenges Governor McMaster's interim appointment of Condon to fill the vacancy created by former Chairman W. Leighton Lord III's December 29, 2017 resignation from the Board. The following facts are not in dispute. Former Chairman of the Board W. Leighton Lord III resigned from his position on December 29, 2017. At that time, the Senate was in recess.
**318 The Senate reconvened on January 9, 2018. During the eleven days from Lord's resignation to the date the Senate reconvened, Governor McMaster did not make a recess appointment.
On March 7, 2018, pursuant to section 58-31-20(A) of the South Carolina Code (2015), Governor McMaster formally nominated Condon to serve as chairman of the Board for the remainder of Lord's unexpired term and for a succeeding full term. On March 13, 2018, the Senate referred Condon's nomination to the Senate Judiciary Committee for consideration. Thereafter, as required by section 58-3-530(14) of the South Carolina Code (2015), the State Regulation of Public Utilities Review Committee (PURC) screened Condon and determined he met the qualifications of section 58-31-20(C) of the South Carolina Code (2015). On May 4, 2018, PURC reported Condon's qualification to the Clerk of the Senate. On May 8, 2018, the Senate Judiciary Committee held Condon's confirmation hearing, but the Senate adjourned on June 28, 2018, without taking final action on Condon's nomination.
On July 23, 2018, Governor McMaster sent a letter to the Senate advising of his interim appointment of Condon to fill the vacancy created by Lord's resignation. Citing section 1-3-210, Governor McMaster stated he would, during the next regular Senate session, forward a formal appointment of Condon for the Senate's consideration. The Senate objected to Governor McMaster's authority to make this appointment. The Senate and Governor McMaster disagree upon the interpretation of section 1-3-210. Pursuant to Rule 245, SCACR, we granted the Senate's petition for original jurisdiction to review Governor McMaster's interim appointment.
II.
We first address whether President Pro Tempore Leatherman was authorized to bring this action. Pursuant to section 58-31-20(A), the Governor's power to appoint directors of the Public Service Authority is subject to "the advice and consent of the Senate." There can be no doubt, therefore, the Senate has the power to bring suit to *910 litigate what it perceives to be an infringement of its authority under that section. In particular, the Senate may bring an action seeking a declaration **319 whether the Governor exceeded his power by making a recess appointment under the circumstances we explained above. However, the manner in which that Senate power may be exercised-how any governmental power may be exercised-must be determined by law.
The Governor's reappointment of Condon occurred after the Senate adjourned. Thus, the Senate itself never had a chance to vote on whether to authorize President Pro Tempore Leatherman to bring this action. In a written response to the Court's inquiry of what provision of law gives the President Pro Tempore the authority to bring an action on behalf of the Senate without specific Senate authorization, counsel stated the President Pro Tempore "is authorized by virtue of his election to that office and through the tradition and practice of the Senate." We know of no provision of law under which "the tradition and practice" of the Senate could support the President Pro Tempore's authority to bring this action. We are concerned, therefore, that the President Pro Tempore is not authorized to bring this action.
We acknowledge the Court-not the parties-raised this issue, and the Governor does not question the authority of the President Pro Tempore to bring this action. We also acknowledge that similar actions have been brought in the past, and we did not question the authority of the President Pro Tempore to do so. See, e.g. , Drummond v. Beasley , 331 S.C. 559, 503 S.E.2d 455 (1998) ; Williams v. Morris , 320 S.C. 196, 464 S.E.2d 97 (1995). To our knowledge, the issue has never been raised to this Court. However, the limitations on the power of an individual senator to bring an action in furtherance of Senate business are well-established under federal law. In Reed v. County Commissioners of Delaware County, Pennsylvania , 277 U.S. 376, 48 S.Ct. 531, 72 L.Ed. 924 (1928), the Supreme Court of the United States held that Senators of a special committee created by the United States Senate could not sue without express authorization from the Senate to do so. 277 U.S. at 389, 48 S.Ct. 531 ; see also Alissa M. Dolan & Todd Garvey, Cong. Research Serv., R42454, Congressional Participation in Article III Courts: Standing to Sue 11 (2014) (stating "an institutional plaintiff has only been successful in establishing" the authority to bring suit "when it has been authorized to seek judicial recourse on behalf of a house of **320 Congress"). Lower federal courts have relied on Reed and the proposition for which it stands to dismiss lawsuits brought by individual members of Congress, and even lawsuits brought by committees of the House or Senate, without express authorization by the House or Senate. See, e.g. , In re Beef Indus. Antitrust Litig. , 589 F.2d 786, 791 (5th Cir. 1979) (requiring dismissal of appeal without any decision on the merits where the House subcommittee chairmen "failed to obtain a House resolution or any other similar authority before they sought to intervene in the ... case"); see also United States v. Am. Tel. & Tel. Co. , 551 F.2d 384, 391 (D.C. Cir. 1976) (finding the House resolution sufficiently authorized the chairman of a subcommittee to represent the House in the lawsuit); Senate Select Comm. on Presidential Campaign Activities v. Nixon , 498 F.2d 725, 727 (D.C. Cir. 1974) (noting the Senate Select Committee had authorization to sue and enforce subpoenas against the President pursuant to a Senate resolution expressly authorizing the committee to do so); Comm. on Oversight & Gov't Reform v. Holder , 979 F.Supp.2d 1, 21 (D.D.C. 2013) (finding House committee could initiate an action to enforce subpoena where "the House of Representatives ... specifically authorized the initiation of [the] action to enforce the subpoena"); Comm. on Judiciary, U.S. House of Representatives v. Miers , 558 F.Supp.2d 53, 71 (D.D.C. 2008) (concluding the House Committee on the Judiciary could bring civil action where the Committee "ha[d] been expressly authorized by House Resolution to proceed on behalf of the House of Representatives as an institution") (emphasis removed from original).
Despite these concerns, we will address the merits of the Senate's challenge to the Governor's recess appointment of Condon. In future actions, however, the Court must examine the President Pro Tempore's threshold authority to bring the action. In any *911 given case, such authority could derive from a majority vote of the members of the Senate as to the individual case, or it could derive from a rule or statute granting the President Pro Tempore such authority without the need for specific authorization by vote.
III.
Section 58-31-20(A) provides, "In the event of a director vacancy due to death, resignation, or otherwise, the Governor **321 must appoint the director's successor, with the advice and consent of the Senate, and the successor-director shall hold office for the unexpired term." Here, Lord resigned during the 2017 recess of the Senate; there is no dispute that section 58-31-20(A) gives Governor McMaster the authority to appoint Lord's successor and gives the Senate the authority to advise and consent in this endeavor. The first question before the Court is whether Governor McMaster had the authority to appoint Condon during the 2018 recess.
The Governor's authority to make a recess appointment is set forth in section 1-3-210 :
During the recess of the Senate, vacancy which occurs in an office filled by an appointment of the Governor with the advice and consent of the Senate may be filled by an interim appointment of the Governor. The Governor must report the interim appointment to the Senate and must forward a formal appointment at its next ensuing regular session.
If the Senate does not advise and consent thereto prior to sine die adjournment of the next ensuing regular session, the office shall be vacant and the interim appointment shall not serve in hold over status notwithstanding any other provision of law to the contrary. A subsequent interim appointment of a different person to a vacancy created by a failure of the Senate to grant confirmation to the original interim appointment shall expire on the second Tuesday in January following the date of such subsequent interim appointment and the office shall be vacant.
With due focus on the first sentence of the first paragraph of section 1-3-210, the Senate argues the plain language of section 1-3-210 unambiguously authorizes the Governor to make a recess appointment only during the recess in which the vacancy initially arose. Again, in this case, that time frame fell between the date of Lord's resignation, December 29, 2017, and the date the Senate reconvened, January 9, 2018. The Governor did not make a recess appointment during the eleven days remaining in the recess. The Senate claims the 2018 recess appointment was invalid because Governor McMaster's statutory authority to make a recess appointment could be exercised only during the recess in which the vacancy initially arose. The Senate also claims Governor McMaster's **322 recess appointment of Condon is in violation of the separation of powers doctrine.[2]
Governor McMaster claims section 1-3-210 unambiguously allows him to make a recess appointment during any recess in which the vacancy exists. Governor McMaster also contends the doctrine of separation of powers is not offended by his interpretation of the statute.
"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." Hodges v. Rainey , 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute." Id ."Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." Id .
However, a statute "must be read as a whole and sections which are part of the same general statutory law must be construed together and each one given effect."
*912 CFRE, L.L.C. v. Greenville Cty. Assessor , 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011) (quoting S.C. State Ports Auth. v. Jasper Cty. , 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006) ). As such, "we read the statute as a whole and in a manner consonant and in harmony with its purpose." Id ."We therefore should not concentrate on isolated phrases within the statute." Id . In addition, "we must read the statute so 'that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [the statute] to have some efficacy, or the legislature would not have enacted it into law.' " Id . (quoting State v. Sweat , 379 S.C. 367, 382, 665 S.E.2d 645, 654 (Ct. App. 2008), aff'd , 386 S.C. 339, 688 S.E.2d 569 (2010) ).
**323 A.
In order to determine whether section 1-3-210 unambiguously authorizes the Governor to make a recess appointment only during the recess in which the vacancy arose, we must explore the meaning of the first sentence of the first paragraph of section 1-3-210, which reads as follows: "During the recess of the Senate, vacancy which occurs in an office filled by an appointment of the Governor with the advice and consent of the Senate may be filled by an interim appointment of the Governor." Does the phrase "During the recess of the Senate" relate to when the vacancy occurs or to when the vacancy may be filled? The Senate contends the phrase unambiguously relates to both, thus temporally restricting the Governor's initial authority to make a recess appointment to the recess in which the vacancy first arose. Governor McMaster contends the phrase unambiguously relates not to when the vacancy first arose, but to when the Governor may make a recess appointment, i.e., during any recess of the Senate.
The Senate and the Governor are also at odds as to the meaning to be given to the word "occurs" as it is used in the statute. The Senate claims the word "occurs" is used in its basic literal sense and can only mean "the sudden happening of an event." Thus, the Senate argues, the Governor has the authority to make recess appointments only during the recess in which the vacancy first arose, and if the Governor fails to do so, the power to make a recess appointment for that vacancy is forfeited. Governor McMaster contends a vacancy may "occur" during the recess of the Senate even though it may have come into being before that recess; the Governor contends the weight of authority equates the term "occurs" with the term "exists," thus reducing or removing the temporal limitations of the Governor's recess-appointment authority.
The Recess Appointments Clause found in the United States Constitution contains language similar to section 1-3-210. It provides, "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const., art. II, § 2, cl. 3. The meaning of this clause has been disputed in the federal courts. Because section 1-3-210 is similar[3] to, and was enacted in the **324 same spirit and for the same purpose as, the Recess Appointments Clause, we will survey federal jurisprudence on the issue. See Unisun Ins. v. Hawkins , 342 S.C. 537, 542, 537 S.E.2d 559, 561-62 (Ct. App. 2000) (noting that where a state rule has adopted the language of a federal rule, federal cases interpreting the federal rule are persuasive).
In National Labor Relations Board v. Noel Canning , --- U.S. ----, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014), the United States Supreme Court considered the question of whether the President's appointment of three members to the National Labor Relations Board (N.L.R.B.) during a three-day Senate adjournment violated the Recess Appointments *913 Clause. 134 S.Ct. at 2552. The dispute arose when the N.L.R.B. found Noel Canning, a Pepsi-Cola distributor, had unlawfully refused to reduce to writing and execute a collective-bargaining agreement with a labor union. Id . at 2557. Noel Canning subsequently asked the United States Court of Appeals for the District of Columbia Circuit to set the Board's order aside, arguing that three of the five Board members had been invalidly appointed, leaving the Board without the three lawfully appointed members necessary for it to act. Id .
The President had appointed the three N.L.R.B. board members during a three-day recess provided for in a Senate resolution governing pro forma sessions that were taking place until the Senate resumed ordinary business. Id . One of the appointments had been pending in the Senate for approximately one year, while the other two had been pending several weeks at the time the President invoked the Recess Appointments Clause and appointed all three to the N.L.R.B. Id . Noel Canning argued the Recess Appointments Clause did not authorize the appointments because the Recess Appointments Clause did not contemplate nominations during such a short recess. Id .
**325 The D.C. Circuit Court of Appeals concluded the appointments were impermissible under the Recess Appointments Clause, holding the phrase "the recess of the Senate" did not include recesses within a formal session of Congress. Id . at 2557-58. The Court of Appeals further found that the phrase "vacancies that may happen during the recess" applies only to vacancies that come into existence during a particular recess. Id . at 2558.
The Supreme Court affirmed the Court of Appeals in result, holding the Recess Appointments Clause does not apply to a Senate recess of such short duration. Id . at 2567. However, the Supreme Court found the meaning of the phrase "the recess" to be ambiguous and rejected the Court of Appeals' overall interpretation of the Recess Appointments Clause; the Supreme Court articulated the following:
[T]he word "the" in "the recess" might suggest that the phrase refers to the single break separating formal sessions of Congress. That is because the word "the" frequently (but not always) indicates "a particular thing." But the word can also refer "to a term used generically or universally." The Constitution, for example, directs the Senate to choose a President pro tempore "in the Absence of the Vice-President." And the Federalist Papers refer to the chief magistrate of an ancient Achaean league who "administered the government in the recess of the Senate." Reading "the" generically in this way, there is no linguistic problem applying the Clause's phrase to both kinds of recess. And, in fact, the phrase "the recess" was used to refer to intra-session recesses at the time of the founding.
Id . at 2561 (internal citations omitted). More importantly, the Court further found the intent of the Recess Appointments Clause required a broad interpretation in order to effectuate its purpose. Id . Because the Clause was intended to facilitate the continued functioning of the federal government during a Senate recess, the Court found the President has the power to make such appointments during either inter- or intra-session recesses, and the "capacity of the Senate to participate in the appointments process has nothing to do with the words it uses to signal its departure." Id .
The Supreme Court also rejected the Court of Appeals' finding that the clause "Vacancies that may happen during the **326 Recess of the Senate" includes only vacancies that arise during a recess. Id . at 2567. The Court found the term "that may happen" can be read to include not only the initial occurrence of an event, but the existence of an event that may happen to fall during a given period of time. Id . The Court, in finding the clause was ambiguous, examined the history of the usage of the term "happen" with respect to vacancies:
Thomas Jefferson wrote that the Clause is "certainly susceptible of [two] constructions." It "may mean 'vacancies that may happen to be' or 'may happen to fall' " during a recess. Jefferson used the phrase in the first sense when he wrote to a job seeker that a particular position was unavailable, but that he (Jefferson) was "happy *914 that another vacancy happens wherein I can ... avail the public of your integrity & talents," for "the office of Treasurer of the US. is vacant by the resignation of mr Meredith." See also Laws Passed by the Legislature of Florida, No. 31, An Act to Organize and Regulate the Militia of the Territory of Florida § 13, H.R. Exec. Doc. No. 72, 27th Cong., 3d Sess., 22 (1842) ("[W]hen any vacancy shall take place in the office of any lieutenant colonel, it shall be the duty of the colonel of the regiment in which such vacancy may happen to order an election to be held at the several precincts in the battalion in which such vacancy may happen .") (emphasis added).
Similarly, when Attorney General William Wirt advised President Monroe to follow the broader interpretation, he wrote that the "expression seems not perfectly clear. It may mean 'happen to take place:' that is, 'to originate ,' " or it "may mean, also, without violence to the sense, 'happen to exist.' " The broader interpretation, he added, is "most accordant with" the Constitution's "reason and spirit."
We can still understand this earlier use of "happen" if we think of it used together with another word that, like "vacancy," can refer to a continuing state, say, a financial crisis. A statute that gives the President authority to act in respect to "any financial crisis that may happen during his term" can easily be interpreted to include crises that arise before, and continue during, that term.
Id . at 2567-68 (internal citations omitted).
The Supreme Court concluded that the clause "Vacancies that may happen during the Recess of the Senate" was **327 ambiguous and a broad reading permitting the President to fill vacancies existing during a legislative recess was more reasonable given the purpose of the Recess Appointments Clause in ensuring the continued functioning of the federal government. Id . at 2568-73.
Other federal courts have offered equally persuasive commentary on this controversy. The United States Court of Appeals for the Eleventh Circuit opined:
About the phrase in the Recess Appointments Clause that speaks of filling "Vacancies that may happen during the Recess," we accept this phrase, in context, means that, if vacancies "happen" to exist during a recess, they may be filled on a temporary basis by the President. This view is consistent with the understanding of most judges that have considered the question, written executive interpretations from as early as 1823, and legislative acquiescence.
On its face, the phrase is open to more than one interpretation. For example, the word "happen" can be defined as "befall" which has been defined as "happen to be." Therefore, the phrase's most accepted interpretation (upon which the President has relied and that we too accept) does not contradict the plain meaning rule.
In addition, as we understand the history, early Presidents-when delegates to the Constitutional Convention were still active in government-made recess appointments to fill vacancies that originated while the Senate was in Session. For example, President Washington, during a Senate break in 1789, appointed Cyrus Griffin to fill a judgeship created during a previous Session; and President Jefferson, during a Senate break in 1801, appointed three judges to fill vacancies created during a previous Session.
Congress at least implicitly agrees with this view of recess appointments. Furthermore, interpreting the phrase to prohibit the President from filling a vacancy that comes into being on the last day of a Session but to empower the President to fill a vacancy that arises immediately thereafter (on the first day of a recess) contradicts what we understand to be the purpose of the Recess Appointments Clause: to keep important offices filled and the government functioning.
**328 Evans v. Stephens , 387 F.3d 1220, 1226-27 (11th Cir. 2004) (internal citations omitted).
In addition, the United States Court of Appeals for the Ninth Circuit explained the problematic policy implications in a narrow reading of the Recess Appointments Clause:
[Such an] interpretation would lead to the absurd result that all offices vacant on the day the Senate recesses would have to *915 remain vacant at least until the Senate reconvenes. Not only judicial positions, but all offices within the purview of article II, § 2, clause 2 would have to remain vacant. The positions of cabinet members and other high government officials would have to remain unfilled until the return of the Senate. If a vacancy occurred on the last day before the Senate's recess, the President would be without power to fill that vacancy in the ensuing recess. Even assuming that the Senate was informed of the vacancy prior to its recess and the President submitted a timely nomination, the Senate would still be faced with the dilemma of either confirming a candidate of whose qualifications little is known or leaving that office vacant until the Senate reconvenes. We agree with the Second Circuit that this interpretation "would create Executive paralysis and do violence to the orderly functioning of our complex government."
United States v. Woodley , 751 F.2d 1008, 1012-13 (9th Cir. 1985).[4]
States have likewise noted the difficulty in ascertaining the precise understanding of when an event "occurs" or "happens" within the context of recess appointments. In Fritts v. Kuhl , the New Jersey Supreme Court held the governor of New **329 Jersey properly filled a judgeship, the vacancy of which arose while the state legislature was in session, despite the fact that the legislature failed to confirm the appointee. 51 N.J.L. 191, 17 A. 102, 107-08 (N.J. Sup. Ct. 1889). The New Jersey Constitution provided that "when a vacancy happens during the recess of the legislature in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy, and the commission shall expire at the end of the next session of the legislature, unless a successor shall be sooner appointed." Id . at 102. The court considered the question of whether a vacancy that arose during a legislative session was considered a vacancy during the subsequent recess where the governor appointed an individual during the legislative session that the legislature declined to confirm. Id . at 102. The court articulated the difficulty in adopting a simplistic reading of the term "happens," stating:
The word "happen," in its strictest literal sense, signifies an unexpected event. It is also not uncommonly used as synonymous with "occur," "take place," "exist," and "happens to be." In its most rigorous meaning, if the contingency implied by it is referred strictly to the time of the occurrence of the vacancy, it will exclude the power of the governor to appoint where an official term expires by its own limitation in the recess, for in that there is nothing uncertain; the time is fixed and definite. On the contrary, it may be said that while there is no uncertainty as to the point of time when the vacancy will occur in such a case, there is uncertainty whether the senate will be in session, and therefore a word implying an unexpected event is properly used. It may also be argued that if the uncertainty implied by the word "happens" is as to the senate being in session, the vacancy does not happen then,-the time of that is certain, but the senate happens not to be in session, and that the constitutional clause should be read as follows: "When it happens that the senate is not in session when there is a vacancy." This would give the governor power to appoint in all cases of vacancy. These suggestions are made to show that the import of this clause is not free from doubt.
Id . at 102-03.
Finally, in Gibbes , this Court tangentially addressed the issue of whether a vacancy *916 "occurred" during a recess of the **330 General Assembly when the vacancy initially arose while the General Assembly was still in a preceding session. 107 S.C. at 196-97, 92 S.E. at 334-35. Section 694 of the Civil Code of 1912 provided that "any vacancies which may happen in any of the said offices during the recess of the Senate may be filled by the Governor," and named the offices which could be so filled. Id . at 194, 92 S.E. at 333. Though the vacancy at issue initially arose during a previous regular session of the General Assembly, the governor made the recess appointment following the General Assembly's adjournment. See id . at 196-97, 92 S.E. at 333. While our observation on this point was arguably dictum, we noted "[t]he vacancy 'occur[red]' during the recess, even though it was initialed before the recess." Id . at 197, 92 S.E. at 335.
The reasoning advanced in Noel Canning , Evans , and Woodley , among others, is sound. We find the language of section 1-3-210, specifically the phrases, "During the recess of the Senate," and "vacancy which occurs," is ambiguous. Therefore, in interpreting the statute, we must ascertain and effectuate the intent of the legislature. Hodges , 341 S.C. at 85, 533 S.E.2d at 581.
We find the General Assembly intended to ensure a more efficient transfer of authority among the myriad of important administrative positions, the functioning of which are necessary to effectively run a complex government. We find that in order to fulfill this purpose, the General Assembly intended the first paragraph of section 1-3-210 to apply to vacancies that exist during a recess. See Noel Canning , 134 S.Ct. at 2567-69 ; Evans , 387 F.3d at 1226-27 ; Gibbes , 107 S.C. at 197, 92 S.E. at 335 ; Fritts , 17 A. at 107-08 ; see also State v. Young , 137 La. 102, 68 So. 241, 247 (1915) (stating that where the state constitution provided "[t]he Governor shall have the power to fill vacancies that may happen during the recess of the Senate," a vacancy which arose during a regular legislative session was properly filled by the governor during the ensuing recess). Webster's Dictionary provides, as the first definition of "occur," the following: "to be present or met with: EXIST." Webster's Third International Dictionary 1561 (3d ed. 2002).
We further find section 1-3-210 references the recess of the Senate in a universal sense, meaning any recess of the **331 Senate. See Noel Canning , 134 S.Ct. at 2561 ; Allocco , 305 F.2d at 712-15 ; In re Farrow , 3 F. at 115-16. Therefore, we hold section 1-3-210 gives the Governor the power to make a recess appointment to any vacancy that exists during a recess of the Senate, regardless of when the vacancy initially arose. See State ex rel. Saint v. Irion , 169 La. 481, 125 So. 567, 570 (1929) (noting that "even in a doubtful case, a statute providing for the filling of a vacancy must be construed so as to avoid" leaving an office vacant).
One obvious limitation upon this exercise of power by the Governor is found in the second paragraph of section 1-3-210. This limitation, not applicable to the instant case, provides that if the Governor makes a recess appointment and the recess appointee is not confirmed by the Senate during the ensuing regular session, the Governor may make another recess appointment during the next Senate recess, but the next appointee must be a different person. That recess appointment of a different person expires on the second Tuesday in January following the date of such recess appointment, at which time the office is considered vacant.
Next, we turn to the Senate's argument that our interpretation of section 1-3-210 renders as surplusage the language in the second paragraph granting the Governor the power to fill the vacancy created by the Senate's failure to confirm the interim appointee. The Senate maintains that if the first paragraph of the statute means the Governor may fill any vacancy that exists during a recess of the Senate, regardless of when the vacancy arose, there would be no need to grant the Governor the power to fill the vacancy created by the Senate's failure to confirm the prior recess appointment. We disagree with the Senate. As we have discussed, the second paragraph can be plainly read to limit the Governor's recess appointment power with respect to an immediately previous recess appointee, and our reading of the first paragraph of the statute in no way *917 impacts this restriction. The meaning of the second paragraph is clear, and the factual scenario contemplated therein is not in play in this case: if the Governor makes a recess appointment and the Senate does not confirm the appointment during the ensuing regular session, the Governor may not recess-appoint the same person during the next recess. **332 B.
The Senate argues our interpretation of section 1-3-210 will incentivize the executive branch to engage in a dangerous expansion of executive power. The Senate contends our interpretation of the statute would encourage the following scenario: The Governor can refuse to appoint someone to a vacancy once it arises during a Senate session, wait until the Senate adjourns, and make a recess appointment. Then, if the Senate rejects the recess appointment upon presentment in the ensuing legislative session, the Governor can refuse to submit another appointment, and, after the Senate adjourns, the Governor can make another recess appointment to the same vacancy. The Senate suggests this process could continue ad infinitum to the complete subversion of the government, and would constitute a degradation of the checks on executive power ordained by the South Carolina Constitution. See S.C. Const. art. I, § 8 ("In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other."); see also Heyward v. Long , 178 S.C. 351, 377, 183 S.E. 145, 156 (1935) ("The principle is universally recognized that the Governor of a state has no inherent power of appointment to office, and that his power must be found in the Constitution or statutes of the state .").
We note concerns of this sort have been commonplace since the foundation of the Republic. The Supreme Court grappled with the problem of hypothetical government dysfunction in Noel Canning , stating:
The Clause's purpose strongly supports the broader interpretation. That purpose is to permit the President to obtain the assistance of subordinate officers when the Senate, due to its recess, cannot confirm them. Attorney General Wirt clearly described how the narrower interpretation would undermine this purpose:
"Put the case of a vacancy occurring in an office, held in a distant part of the country, on the last day of the Senate's session. Before the vacancy is made known to the President, the Senate rises. The office may be an important **333 one; the vacancy may paralyze a whole line of action in some essential branch of our internal police; the public interests may imperiously demand that it shall be immediately filled. But the vacancy happened to occur during the session of the Senate; and if the President's power is to be limited to such vacancies only as happen to occur during the recess of the Senate, the vacancy in the case put must continue, however ruinous the consequences may be to the public."
Examples are not difficult to imagine: An ambassadorial post falls vacant too soon before the recess begins for the President to appoint a replacement; the Senate rejects a President's nominee just before a recess, too late to select another. Wirt explained that the "substantial purpose of the constitution was to keep these offices filled," and "if the President shall not have the power to fill a vacancy thus circumstanced, ... the substance of the constitution will be sacrificed to a dubious construction of its letter." Thus the broader construction, encompassing vacancies that initially occur before the beginning of a recess, is the "only construction of the constitution which is compatible with its spirit, reason, and purposes; while, at the same time, it offers no violence to its language."
Noel Canning , 134 S.Ct. at 2568-69 (internal citations omitted).
Even under the Senate's interpretation of the statute, hypothetical machinations by the Governor are certainly possible. For example, if Governor McMaster appointed someone to fill this vacancy during the eleven days remaining in the recess during which Lord resigned, the Senate would have had *918 the authority to reject the nomination of that person during the ensuing regular session. Then, under the second paragraph of section 1-3-210, Governor McMaster would then have the power to recess-appoint a different person to serve during the next recess, and the Senate could then again rightfully decline to confirm that person during the next regular session. In such a scenario, this succession of recess-appointed chairmen of the Board could easily decide to conduct all business of the Board during the roughly six-month recess of the Senate, and there would be nothing the Senate could do to stop it.
We believe the General Assembly intended to allow the Governor to fill the vacancy with a recess appointment and **334 allow the Senate to make a confirmation decision during the ensuing legislative session. If the Senate declines to confirm, the Governor must start over. See Noel Canning , 134 S.Ct. at 2577 ("[T]he Recess Appointments Clause is not designed to overcome serious institutional friction. It simply provides a subsidiary method for appointing officials when the Senate is away during a recess. Here, as in other contexts, friction between the branches is an inevitable consequence of our constitutional structure. That structure foresees resolution not only through judicial interpretation and compromise among the branches but also by the ballot box."). Our construction of section 1-3-210 allows the mechanics of the government to proceed. If we were to adopt the Senate's interpretation of the statute, and the Governor, for whatever reason, failed to make an appointment to a vacancy during the recess in which the vacancy initially arose, the Senate could hold the vacancy open in perpetuity and thwart the functioning of the government. We conclude this was not the intent of the General Assembly. We believe our reading of section 1-3-210 preserves the intent of the General Assembly to bestow the recess appointment power on the Governor, while, at the same time, retain for the Senate a significant check on that power. See CFRE, L.L.C. , 395 S.C. at 74, 716 S.E.2d at 881 ("[W]e read the statute as a whole and in a manner consonant and in harmony with its purpose."). Under our reading, the Governor retains the recess appointment power granted in the statute and the Senate retains the power to reject the Governor's appointee during the next regular session.
IV.
We hold section 1-3-210 authorized the Governor to make a recess appointment of Lord's successor during any recess of the Senate in which the vacancy existed. Such authority does not violate the doctrine of separation of powers. Accordingly, we hold that on July 23, 2018, Governor McMaster properly exercised his recess appointment power in appointing Condon as Chairman of the Board.
DECLARATORY JUDGMENT ISSUED.
BEATTY, C.J., KITTREDGE, HEARN, FEW and JAMES, JJ., concur.

S.C. Code Ann. § 1-3-210 refers to a recess appointment as an "interim appointment." We use these terms interchangeably.

In its brief to this Court, the Senate alternatively argued that even if Governor McMaster had the threshold authority to appoint Condon during a recess in which the vacancy did not arise, section 1-3-210 prohibited Governor McMaster from appointing Condon because the Senate did not confirm Condon during the 2018 session. At oral argument, the Senate appropriately conceded otherwise; consequently, the Senate's sole argument is that Governor McMaster did not have the authority to appoint Condon during the 2018 recess.

The Recess Appointments Clause contains the term "happen," whereas section 1-3-210 contains the term "occurs." We have previously used these terms synonymously. See Gibbes v. Richardson , 107 S.C. 191, 194-97, 92 S.E. 333, 334-35 (1917) ; see also Ins. Co. of N. Am. v. Constr. Co. , 22 Cal.3d 409, 149 Cal.Rptr. 292, 583 P.2d 1335, 1337 (1978) (noting that an occurrence is synonymous with something that happens); Richardson v. Young , 122 Tenn. 471, 125 S.W. 664, 683 (1910) ("The words 'occur' and 'happen' are usually used in referring to vacancies in office, and mean the same thing."); Webster's Third International Dictionary 1561 (3d ed. 2002) (providing that "occur" is a synonym for "happen").

Other authorities offer similar pronouncements. See, e.g. , United States v. Allocco , 305 F.2d 704, 712-15 (2d Cir. 1962) (finding the President may make appointments to all vacancies that exist during a Senate recess); In re Farrow , 3 F. 112, 116 (N.D. Ga. 1880) (finding the President has power to make appointments "notwithstanding the fact that the vacancy filled by his appointment first happened when the senate was in session"); see also Exec. Auth. to Fill Vacancies , 1 Op. Att'y Gen. 631, 633 (1823) ("[W]hether [a vacancy] arose during the session of the Senate, or during their recess, it equally requires to be filled."); Power of President to Fill Vacancies , 2 Op. Att'y Gen. 525, 528 (1832) (opining that the President may make recess appointments "if there happen to be any vacancies during the recess"); Vacancy in Office , 19 Op. Att'y Gen. 261, 263 (1889) ("[W]herever there is a vacancy there is a power to fill it.") (emphasis removed from original).