# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Mark Gregory Thompson and Jane Page Thompson, individually and behalf of all those similarly situated, Appellants,

v.

Clay Killian, in his official capacity as Aiken County Administrator, Jason Goings, in his official capacity as Treasurer of Aiken County, Aiken County Council, Aiken County, City of Aiken, Aiken Council, and Stuart Bedenbaugh, in his official capacity as City Manager of Aiken, Respondents.

Appellate Case No. 2023-000442

———————

Appeal From Aiken County
William P. Keesley, Circuit Court Judge

———————

Opinion No. 28305
Heard February 12, 2025 – Filed November 5, 2025

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————

William Camden Lewis, Brady Ryan Thomas, and Grace Madeline Babcock, all of Richardson Thomas, LLC, of Columbia; and Terry E. Richardson, Jr., of Richardson Thomas, LLC, of Barnwell, all for Appellants.

Andrew F. Lindemann, of Lindemann Law Firm, P.A., of Columbia, for Respondents City of Aiken, Aiken City

Council, and Stuart Bedenbaugh in his official capacity as City Manager of Aiken. Bradley Truman Farrar, of Aiken, for Respondents Aiken County, Aiken County Council, Jason Goings, in his official capacity as Treasurer of Aiken County, and Clay Killian, in his official capacity as Aiken County Administrator.

James Keith Gilliam, of Burr & Forman LLP, of Greenville, for Amicus Curiae Beaufort County. D. Malloy McEachin, Jr., of D. McEachin Law Firm, P.A., of Florence and Steve A. Matthews, of Haynsworth Sinkler Boyd, P.A., of Columbia, both for Amicus Curiae Florence County. Sarah P. Spruill, of Haynsworth Sinkler Boyd, P.A., of Greenville, for Amici Curiae Greenville County and Spartanburg County. John Carroll Moylan, III, and Mary Lucille Dinkins, both of Wyche P.A., of Columbia, for Amicus Curiae Horry County.

---

**JUSTICE VERDIN:** Mark and Jane Thompson (the Thompsons) brought this action against Clay Killian, in his official capacity as Aiken County Administrator; Jason Goings, in his official capacity as Treasurer of Aiken County; Aiken County Council; Aiken County; the City of Aiken; Aiken City Council; and Stuart Bedenbaugh, in his official capacity as Aiken City Manager (collectively "Respondents"), seeking declaratory and monetary relief for the imposition of Aiken City and County's road maintenance fees. After the trial court granted Respondents' Rule 12(b)(1) and (6), SCRCP, motions, the Thompsons appealed to the court of appeals. We certified that appeal and now answer whether the trial court erred in (1) finding the South Carolina Revenue Procedures Act (RPA)[1] deprived it of subject matter jurisdiction over the Thompson's tax claims; (2) finding that the catchall provision of section 12-60-80(C) barred the Thompsons' class action; (3) dismissing the Thompsons' claim under section 8-21-30 of the South Carolina Code (2019); (4) finding that sovereign immunity barred the Thompsons' unjust enrichment claim; and (5) dismissing the Thompsons' claim under Article I, § 3 of the South Carolina Constitution. We affirm in part, reverse in part, and remand to the trial court to allow the declaratory judgment cause of action to proceed individually and as a class.

---

[1] S.C. Code Ann. §§ 12-60-10 to -3390 (2014 & Supp. 2024).

## I. Factual and Procedural Background

In 1992, following this Court's decision in *Brown v. County of Horry*, 308 S.C. 180, 417 S.E.2d 565 (1992), Aiken County Council passed ordinance 95-5-19, establishing a road maintenance fee to be paid for each registered vehicle in Aiken County. That ordinance read:

> Effective July 1, 1992, a mandatory road maintenance fee as established in the annual County Operating Budget Ordinance on each motorized vehicle licensed in Aiken County is to be included on motor vehicle tax notices with the proceeds going into a separate fund for accounting purposes specifically to be used for maintenance and improvements of the county road system, to include road signs and correction of drain-age problems impacting the county road system.

AIKEN COUNTY, S.C., CODE § 95-5-19 (1992). Aiken County continuously enforced that ordinance, and in 2021, the fee was twenty-five dollars per registered vehicle.

In 2017, the City of Aiken amended the Aiken City Code to establish a road maintenance fee like Aiken County's. That ordinance read:

> Effective January 1, 2017, a mandatory road maintenance fee as established in the annual City Operating Budget Ordinance on each motorized vehicle licensed in the City is to be included on motor vehicle tax notices with the proceeds going into a separate fund for accounting purposes specifically to be used for maintenance and improvements of the city road system, to include road signs and correction of drainage problems impacting the city road system.

AIKEN, S.C., CODE § 06202016 (2016). However, after our decision in *Burns v. Greenville County Council*, 433 S.C. 583, 861 S.E.2d 31 (2021), the City of Aiken adopted Ordinance Number 08232021F, AIKEN, S.C., CODE § 08232021F (2021), rescinding the road maintenance fee effective July 1, 2021, and requiring the City to reimburse all road maintenance fees paid after that date.

The Thompsons reside in Aiken County within the limits of Aiken City and have paid both road maintenance fees in all years they were levied. In November 2021, the Thompsons brought this action, individually and as a class, against Respondents. In their complaint, the Thompsons sought a declaratory judgment that the ordinances

were invalid under section 6-1-300(6) of the South Carolina Code (2004 & Supp. 2025), as interpreted in *Burns*, 433 S.C. at 587–88, 861 S.E.2d at 33, and a refund of any unlawfully obtained taxes; (2) damages through an unjust enrichment claim against all Respondents, entitling them to reimbursement of all fees paid; (3) damages through violation of section 8-21-30 against Killian, Goings, and Bedenbaugh, entitling them to ten times the amount of fees improperly charged; and (4) damages or injunctive relief through violation of the Thompsons' rights under Article I, § 3 of the South Carolina Constitution.[2]

A month later, Aiken City and County filed separate motions to dismiss under Rules 12(b)(1) and (6), SCRCP. The trial court then set a hearing on those motions for April 2022. Before that hearing, the Thompsons agreed to dismiss the action against Aiken County Council and Clay Killian. They also agreed to dismiss the section 8-21-30 claim against Bedenbaugh. At the hearing, the Thompsons further stipulated that the declaratory judgment action against the City of Aiken was moot and agreed to dismiss the Article I, § 3 claim because they could not seek monetary relief under the South Carolina Constitution.[3] As a result, the remaining claims were (1) the declaratory judgment claim against Aiken County; (2) the unjust enrichment claim against all Respondents except Aiken County Council and Killian; and (3) the section 8-21-30 claim against Goings.

In companion orders filed in August 2022, the trial court found that it did not have subject matter jurisdiction over the Thompsons' remaining claims because section 12-60-80(C), as interpreted in *Aiken v. S.C. Dep't of Revenue*, 429 S.C. 414, 839 S.C.2d 96 (2020), barred class actions against political subdivision like cities and counties. The trial court declined to reach the City and County's other jurisdictional and sovereign immunity defenses.

The Thompsons then filed motions for reconsideration for both dismissals. The trial court reaffirmed its prior ruling, but, because those dismissals interpreted the complaint as a class action, the trial court scheduled oral arguments to consider the remaining issues. That hearing was set for February 2023.

---

[2] The trial court interpreted the Thompsons' complaint as seeking damages for this constitutional claim. However, the Thompsons argued in their response to Respondent's motions to dismiss and on appeal that they were seeking declaratory relief for this claim.

[3] There is some confusion as to whether the Thompsons did stipulate to the dismissal of this constitutional claim. *See infra* Part VI. However, the trial court interpreted the parties' communications as a stipulated dismissal.

On February 23, 2023, the trial court dismissed the Thompsons' complaint against the City Defendants. The trial court found that the Thompsons were seeking a refund for illegally collected taxes that the RPA exclusively governed and for which the Thompsons had not exhausted their administrative remedies. The trial court also found sovereign immunity barred the unjust enrichment claims against the City Defendants.

Less than a month later, the trial court issued an order dismissing the Thompsons' complaint against the County Defendants on the same grounds as the February 23, 2023 order. The trial court also dismissed the section 8-21-30 claim against Goings because only fees prescribed in chapter 21 are recoverable, and road maintenance fees are not among them. The trial court added that section 8-21-30 only applies when an officer charges a fee and the County Treasurer merely collects the road maintenance fee. Finally, the trial court reiterated that the constitutional claim was dismissed by stipulation but also stated that the Thompsons could not request damages for a violation of the South Carolina Constitution.

On March 14, 2023, the Thompsons appealed those orders to the court of appeals. Before the court of appeals could issue a decision, the Thompsons requested certification of their appeal to this Court, which we granted.

## II. Standard of Review

When reviewing a dismissal under Rule 12(b)(6), SCRCP, we apply "the same standard of review as the trial court." *Patterson v. Witter*, 425 S.C. 213, 225, 821 S.E.2d 677, 684 (2018) (quoting *Doe v. Marion*, 373 S.C. 390, 395, 645 S.E.2d 245, 247 (2007)). "The question is whether, in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.* (quoting *Marion*, 373 S.C. at 395, 645 S.E.2d at 247–48).

Further, "[w]hether subject matter jurisdiction exists is a question of law, which this Court is free to decide with no particular deference to the circuit court." *S.C. Pub. Int. Found. v. Wilson*, 437 S.C. 334, 340, 878 S.E.2d 891, 894 (2022). The interpretation of a statute is also a question of law, which this Court reviews de novo. *S.C. Pub. Int. Found. v. Calhoun Cnty. Council*, 432 S.C. 492, 495, 854 S.E.2d 836, 837 (2021).

## III. Applicability of the Revenue Procedures Act

### a. Tax Exclusions Under Section 12-60-80 (A–C)

Respondents argue that the RPA applies here because the Thompsons challenge the road maintenance fees as unlawful taxes. Thus, subsection 12-60-80(C) bars the class action, while subsections 12-60-80(A) and (B) of the South Carolina Code (2014) bar the individual claims based on the Thompsons' failure to exhaust administrative remedies. We find, however, that the ordinances here do not fall within the RPA's definition of taxes. Accordingly, the RPA does not deprive the trial court of subject matter jurisdiction.

In South Carolina, the guiding principle of statutory interpretation is to give effect to the legislature's intent. *Gordon v. Philips Utils., Inc.*, 362 S.C. 403, 406, 608 S.E.2d 425 (2005). The best evidence of legislative intent is the statute's text, and when the text is clear, courts must apply its plain meaning without resorting to tools of statutory construction. *Miller v. Aiken*, 364 S.C. 303, 307, 613 S.E.2d 364, 366 (2005); *Bayle v. S.C. Dep't Of Transp.*, 344 S.C. 115, 122, 542 S.E.2d 736, 739–40 (Ct. App. 2001).

The RPA limits a trial court's jurisdiction in tax disputes. Subsection (A) states, "[e]xcept as provided in subsection (B), there is no remedy other than those provided in this chapter in any case involving the illegal or wrongful collection of taxes, or attempt to collect taxes." § 12-60-80(A). Subsection (B) permits courts to hear facial constitutional challenges through declaratory judgment actions. § 12-60-80(B). Subsection (C) then prohibits class actions "for the refund of taxes . . . in the Administrative Law Court or any court of law in this state, and the department, political subdivisions, or their instrumentalities, may not be named or made a defendant in any other class action brought in this State." § 12-60-80(C). Yet these jurisdictional limits apply only if the disputed charge, statute, or ordinance qualifies as a tax under the RPA.

The RPA defines "tax" or "taxes" as "taxes, licenses, permits, fees, or other amounts, including interest, regulatory and other penalties, and civil fines, imposed by this title, or subject to assessment or collection by the department." § 12-60-30(27). A tax under the RPA, therefore, must be either established under title 12, or be assessable or collectible by the Department of Revenue. *Id.* The road maintenance fees here meet neither condition.

First, the road maintenance fees here were not established under title 12 but under titles 4 and 6, which govern local governments' powers to impose service or user fees. *See* S.C. Code Ann. § 4-9-30(5)(a) (2021) (granting county governments the ability to charge value-based property taxes and uniform service charges); S.C. Code Ann. § 6-1-330(A) (2004 & Supp. 2025) ("A local governing body . . . is authorized

to charge and collect a service or user fee"); § 6-1-300(6) (stating that service or user fee includes uniform service charges). Additionally, at oral argument, the parties conceded that the General Assembly has not passed legislation, including in title 12, allowing road maintenance fees. Thus, because these fees derive solely from titles 4 and 6—not title 12—they fail to meet the first condition for a tax under the RPA.

Second, the General Assembly has not granted the Department of Revenue authority to assess or collect these fees. *See* S.C. Code Ann, Title 12 *et seq*. Thus, the fees do not meet the RPA's second condition for "taxes" either, and it cannot apply, even if the fees are unlawful taxes under titles 4 and 6.

This reading is consistent with our precedent surrounding road maintenance fees. In *Burns*, we found that a Greenville County road maintenance fee was an unlawful tax under title 6. *Burns*, 433 S.C. at 585–89, 861 S.E.2d at 31–34. In reaching that conclusion, we noted that counties could only impose value-based property taxes, legislatively authorized taxes, and uniform service charges, including service or user fees. *Id.* at 586, 861 S.E.2d at 32 (citing § 4-9-30(5)(a); § 6-1-330(A); § 6-1-300(6)). The Greenville County Ordinance, however, could not be a uniform service charge or a service or user fee because it did not provide a special benefit to the fee payer, apart from the public, as required by subsection 6-1-300(6). *Id.* at 586–88, 861 S.E.2d at 32–33 (citing § 6-1-300(6)). Because it did not qualify as a user fee, it was necessarily a tax under title 6. *Id.* at 590, 861 S.E.2d at 34. That opinion, however, did not address whether the Greenville County road maintenance fee was a tax under the RPA. Accordingly, a finding that the fees here are not taxes under the RPA, but may be taxes under titles 4 and 6, is consistent with *Burns*. At the motion to dismiss stage, that is the only import of *Burns*.

Accordingly, because the road maintenance fees do not fall within the RPA's definition of taxes, its jurisdictional bars do not apply, and the trial court retained subject matter jurisdiction.

### b. Section 12-60-80(C)'s Catchall Provision

Respondents also argue that subsection 12-60-80(C)'s catchall provision, as interpreted in *Aiken*, 429 S.C. at 420, 839 S.E.2d at 99, prohibits all class actions against political subdivisions. We conclude, however, that *Aiken* only addressed class actions against the Department of Revenue. When read in the context of the entire RPA, subsection (C) does not bar class actions against political subdivisions in cases unrelated to value-based property taxes.

As stated, the main goal of statutory interpretation is to give effect to the legislature's intent. *See Gordon*, 362 S.C. at 406, 608 S.E.2d at 427. While a statute's text is the best evidence of that intent, "'a court should not focus on any single section or provision but consider the language of the statute as a whole.'" *Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011) (quoting *Mid-State Auto Auction of Lexington, Inc. v. Altman*, 324 S.C. 65, 69, 476 S.E.2d 690, 692 (1996)).

Subsection (C)'s catchall provision states that "the [Department of Revenue], political subdivisions, or their instrumentalities may not be named or made a defendant in any other class action brought in this State." § 12-60-80(C). While this language is broad in scope, its impact is narrowed by the RPA's express purpose as stated in section 12-60-20. That purpose is to establish procedures for resolving disputes with the Department of Revenue and disputes concerning property taxes.[4] See § 12-60-20; S.C. Code Ann. §12-60-30(18) (2014) ("Property tax means *ad valorem* taxes on real and personal property."). The General Assembly reinforced this intent in Act No. 69 of 2003, which amended section 12-60-80 to add subsection (C). That Act's title makes clear that its purpose was to "REVISE THE MANNER IN WHICH AND CONDITIONS UNDER WHICH DISPUTES OR CLAIMS WITH THE DEPARTMENT OF REVENUE ARE DETERMINED AND RESOLVED." Act No. 69, 2003 S.C. Acts 718, 744. Thus, the RPA is limited in scope to disputes involving the Department of Revenue or value-based property taxes, as is subsection (C)'s catchall provision.

In *Aiken*, we considered whether subsection (C)'s catchall provision barred a class action against the Department of Revenue for the refund of money it collected on behalf of two political subdivisions. 429 S.C. at 416–17, 839 S.E.2d at 97. We held that it did, reasoning:

> Subsection 12-60-80(C) indicates no intent to limit or restrict the general words "any other class action" in the catchall clause of subsection (C) to the specific subject of

---

[4] Section 12-60-20 reads:
> It is the intent of the General Assembly to provide the people of this State with a straightforward procedure to determine a dispute with the Department of Revenue and a dispute concerning property taxes. The South Carolina Revenue Procedures Act must be interpreted and construed in accordance with, and in furtherance of, that intent.

"taxes" set forth in the first portion of subsection (C). To interpret the catchall clause in this fashion would simply amount to an unnecessary re-recitation of the first portion of subsection (C); this would be an absurd and forced construction of the catchall clause of subsection (C).

*Id.* at 420, 839 S.E.2d at 99. That reasoning is sound in cases involving the Department of Revenue, as the legislature intended the RPA to govern all claims against that agency. Even so, the legislative intent behind the RPA demonstrates that subsection (C)'s catchall provision was not meant to extend so broadly for political subdivisions.

Construing subsection (C)'s catchall provision "with, and in furtherance of" the RPA's stated intent, we hold that it bars class actions against political subdivisions only in disputes concerning value-based property taxes. § 12-60-20. Because the claims here do not involve value-based property taxes, subsection (C) does not apply, and the trial court retained subject matter jurisdiction.

Ultimately, we find that the Aiken City and County Ordinances do not constitute taxes under the RPA. Thus, subsection 12-60-80(A), (B), and (C) did not deprive the trial court of subject matter jurisdiction over the Thompsons' individual or class action claims, whether or not the ordinances are taxes under titles 4 and 6.[5] Additionally, reading subsection (C)'s catchall provision in light of the RPA's express legislative intent, we find that it does not bar this class action because it does not involve value-based property taxes. We, therefore, reverse on this issue.

We acknowledge two possible concerns in our statutory interpretation that may appear incongruous: (1) limiting the RPA to taxes imposed by Title 12 of the South Carolina Code of Laws; and (2) limiting section 12-60-80(C)'s class action

---

[5] This raises additional questions regarding the Thompsons' declaratory judgment action and the validity of the refund request attached to that claim as further relief. *See* S.C. Code Ann. § 15-53-120 (2005) ("Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper."). However, because the trial court dismissed this claim for lack of subject matter jurisdiction, we remand for the trial court to answer any potential questions first. *Langley v. Boyter*, 284 S.C. 162, 181, 325 S.E.2d 550, 561 (Ct. App. 1984) ("[A]ppellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked"), *quashed on other grounds*, 286 S.C. 85, 332 S.E.2d 100 (1985).

prohibition to disputes with the Department of Revenue and disputes concerning property taxes.  If the Court's decision today appears inconsistent with the apparent overarching legislative intent, the remedy lies with the General Assembly.  Today's decision is faithful to the Court's limited role—applying statutory law as written.

## IV.    Section 8-21-30

Turning to the Thompsons' claims for monetary relief, the trial court dismissed the section 8-21-30 claim for two reasons.  First, it found that the statute applies only to fees for services prescribed under chapter 21 of the South Carolina Code, while road maintenance fees are governed by titles 4 and 6.  Second, it found that section 8-21-30 applies only to charges for specific services, while Goings merely collected these fees as County Treasurer.  We agree.

Section 8-21-30 provides: "[i]f any officer herein named shall charge any other fee or fees for any services herein mentioned, such officer shall be liable to forfeit ten times the amount so improperly charged . . . ."  As noted, "[w]hat a legislature says in the text of a statute is considered the best evidence of the legislative intent or will.  Therefore, the courts are bound to give effect to the expressed intent of the legislature." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992)).  Here, the plain language of section 8-21-30 limits its applicability to specific officers and fees for services specified in chapter 21.

The first part of section 8-21-30 establishes the conditions that must occur for an officer to be liable to forfeit the improperly charged fees.  The phrase "any officer herein named" restricts liability to officers identified in chapter 21, while "for any services herein mentioned" confines the provision's scope to fees for specific services listed in the chapter.  Thus, to prevail under this section, a plaintiff must show that the defendant (1) was an officer named in chapter 21 and (2) charged an improper fee for services mentioned in chapter 21.

While a county treasurer is mentioned in chapter 21, a road maintenance fee is not. *See* S.C. Code Ann. § 8-21-310 (Supp. 2024) (naming the county treasurer, clerk of court, and register of deeds and allowing them to charge filing or recording fees in stated amounts for various legal documents); S.C. Code Ann. § 8-21-10 to -1080 (2019 & Supp. 2024) (failing to mention a road maintenance fee).  Thus, because road maintenance fees are not included, these ordinances cannot form the basis for a section 8-21-30 claim.

Further, section 8-21-30 applies only to officers who "improperly charged" a fee, not one who merely collected it. Though the difference between the word "charge" and "collect" in a statute may seem small, "we must read the statute so 'that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [the statute] to have some efficacy, or the legislature would not have enacted it into law.'" *Senate by & through Leatherman v. McMaster*, 425 S.C. 315, 322, 821 S.E.2d 908, 912 (2018) (alterations in original) (quoting *CRFE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011)). Section 8-21-30 was enacted in 1878. 1878 S.C. Acts and Joint Resolutions, 631 (1878). Around that time, the word "charge" meant "[t]o set or lay on; to impose, as a tax . . . ." *Charge, An American Dictionary of the English Language* (1828). Moreover, the word "collect" meant "[t]o gather money or revenue from debtors; to demand and receive . . . ." *Collect, An American Dictionary of the English Language* (1828). Based on these words' ordinary meanings when section 8-21-30 was created, the statute applies to officers who improperly impose fees, not those who merely collect them. Here, Goings' role was limited to collecting a fee levied by the Aiken County Council, removing him from liability under the statute.

Section 8-21-30, therefore, does not apply to road maintenance fees or Goings' actions, and we affirm this claim's dismissal.

## V.    Unjust Enrichment and Sovereign Immunity

As for the Thompsons' unjust enrichment claim, the trial court found that the South Carolina Tort Claims Act (SCTCA)[6] restored sovereign immunity to the state government, its political subdivisions, and its employees, including for equitable claims. We agree.

In response to judicial abrogation of sovereign immunity in *McCall v. Baston*, 285 S.C. 243, 245–46, 329 S.E.2d 741, 742 (1985), the General Assembly enacted the SCTCA to establish a comprehensive framework for "governmental liability," *Murphy v. Richland Mem'l Hosp.*, 317 S.C. 560, 563, 455 S.E.2d 688, 690 (1995) (citing the SCTCA). This framework restored sovereign immunity except where the General Assembly provided an exception. § 15-78-20(b) (stating that government liability is limited "only to the extent provided herein"); *See Murphy*, 317 S.C. at 563, 455 S.E.2d at 690 ("The Act first completely restores sovereign immunity."). One exception allowed contract claims, as the SCTCA stated: "[n]othing in this

---

[6] S.C. Code Ann. §§ 15-78-10 to -220 (2005 & Supp. 2024).

chapter affects liability based on contract nor does it affect the power of the State or its political subdivision to contract."  § 15-78-20(d).  While equitable claims arise from contract law principles, they remain distinct and do not fall under this exception.

An unjust enrichment claim is based on a judicially implied contract, allowing courts to afford relief when no enforceable contract exists, or harm falls outside of a contract's scope.  *See Earthscapes Unlimited, Inc. v. Ulbrich*, 390 S.C. 609, 616, 703 S.E.2d 221, 225 (2010) ("Absent an express contract, recovery under quantum meruit is based on quasi-contract."); *Ellis v. Smith Grading & Paving, Inc.*, 294 S.C. 470, 473, 366 S.E.2d 12, 14 (Ct. App. 1988) ("Unjust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff."); *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 341 S.C. 1, 8, 532 S.E.2d 868, 872 (2000) ("[Q]uantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy.").  However, while contract and unjust enrichment claims may be "alternative rather than inconsistent remedies," *Franke Assocs. by Simmons v. Russell*, 295 S.C. 327, 332, 368 S.E.2d 462, 465 (1988), they have long been recognized as distinct in South Carolina law.  That is because, as stated, unjust enrichment claims are equitable in nature, while contract claims are legal in nature. *See Myrtle Beach Hosp., Inc.*, 341 S.C. at 8, 532 S.E.2d at 872 (quoting *U.S. Rubber Prods., Inc. v. Town of Batesburg*, 183 S.C. 49, 55, 190 S.E. 120, 126 (1937)) ("In a law action, the measure of damages is determined by the parties' agreement, while in equity, 'the measure of the recovery is the extent of the duty or obligation imposed by law, and is expressed by the amount which the court considers the defendant has been unjustly enriched at the expense of the plaintiff.'"); *Floyd v. Floyd*, 306 S.C. 376, 379–80, 412 S.E.2d 397, 398–99 (1991) (discussing the main purpose rule's role in determining whether a case is at law or equity and the trial judge's roles in both circumstances); *Solomons v. Shaw*, 25 S.C. 112 (1886) (providing a history of the importance of Courts of Equity in South Carolina).  Thus, subsection 15-78-20(b) of the SCTCA restored sovereign immunity for equitable claims, and the contract claims exception in subsection 15-78-20(d) did not change that result.[7]

---

[7] Our sister courts have likewise found that sovereign immunity should apply in quasi-contract cases, even when it does not apply in express contract cases.  *See, e.g., Eastway Wrecker Services, Inc. v. City of Charlotte*, 599 S.E.2d 410 (N.C. Ct. App. 2004); *Baltimore City Bd. Of School Com'rs v. Koba Institute, Inc.*, 5 A.3d 60 (Md. Ct. App. 2010); *Goldstein v. University of Central Florida Bd. of Trustees*, No. 6D23-1203, __ So.3d __ (Fla. 6th DCA Aug. 25, 2023).

This conclusion is based on the SCTCA's plain text, as what was a contract claim and what was not was, and is, well defined under South Carolina law. *See Hodges*, 341 S.C. at 85, 533 S.E.2d at 581 ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning.") *S. Glass & Plastics Co. v. Kemper*, 399 S.C. 483, 481–92, 732 S.E.2d 205, 209 (Ct. App. 2012) ("The elements for a breach of contract are the existence of the contract, its breach, and the damages caused by such breach."); *Silver v. Aabstract Pools & Spas, Inc.*, 376 S.C. 585, 590, 685 S.E.2d 539, 541–42 (Ct. App. 2008) (citing *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001); *R&G Constr., Inc., v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 430, 540 S.E.2d 113, 117 (Ct. App. 2000)) (stating that actions for breach of contract and actions to construe a contract are actions at law). Therefore, this is not an instance of a court finding statutory "elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Instead, it is an example of the General Assembly using a clear and widely understood legal term to waive sovereign immunity only for contract claims in a statute. This conclusion is bolstered by looking at the remainder of subsection 15-78-20(d), which makes clear the SCTCA does not "affect the power of the State or its political subdivision to contract." This additional statement shows the legislature's concern regarding the SCTCA's potential impact on people's willingness to enter into contracts with the government, ensuring individuals will retain the ability to enforce such contracts under the SCTCA. This concern does not extend to equitable claims.

Accordingly, we find that the State maintains its sovereign immunity over equitable claims like the Thompsons' claim here. We, therefore, affirm on this issue, too.

## VI.    Article I, § 3 of the South Carolina Constitution

Finally, the Thompsons argue that the trial court incorrectly characterized their constitutional claim as seeking monetary rather than declaratory relief. They assert that while constitutional claims for monetary relief are impermissible, claims for declaratory relief are not, so the trial court erred in dismissing this claim. We find, however, that this claim was dismissed via stipulated dismissal, which was not appealed and has become the law of the case. Accordingly, we need not reach the Thompsons' issue on appeal.

A trial court must have the chance to decide on an issue for it to be preserved on appeal. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have

been raised to and ruled upon by the trial judge to be preserved for appellate review."); *I'On, LLC v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) ("[T]he losing party generally must both present his issues and arguments to the lower court and obtain a ruling before an appellate court will review those issues and arguments."). Further, "[u]nder the two issue rule, where a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case." *Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010); *Anderson v. S.C. Dep't of Highways & Pub. Transp.*, 322 S.C. 417, 420 n.1, 472 S.E.2d 253, 255 n.1 (1996) ("[I]f a court directs a verdict for a defendant on the basis of the defenses of statute of limitations and contributory negligence, the order would be affirmed under the 'two issue' rule if the plaintiff failed to appeal both grounds or if one of the grounds required affirmance."). Here, the trial court dismissed this claim on more than one ground, but only one issue was appealed.

The trial court first dismissed this claim based on a stipulation by the parties. The trial court noted in its companion orders after the motion to dismiss hearing that "the only remaining action against the City Defendants is for unjust enrichment." The trial court then cited this stipulation in a footnote

> Plaintiffs' counsel stated in page 62 of the transcript 'And, lastly, I will accept the stipulation that money damages aren't being claimed under the due process claim. I would ask, then, that the cause of action be dismissed. And I, certainly, am in agreement with the argument that the – or the concession that the declaratory judgment against the City of Aiken defendants is moot.'

The trial court then dismissed the remaining causes of action against the City of Aiken for lack of subject matter jurisdiction.

This quotation did not come from the Thompsons' counsel, but was from opposing counsel in response to a prior statement by the Thompsons' counsel. Even so, the Thompsons' counsel never objected to the trial court interpreting this as a stipulated dismissal.

Following this order dismissing the claims, the Thompsons filed a Rule 59(e) motion to alter or amend and, later, a reply supporting that motion. Neither the motion nor the reply, however, raised the procedural due process issue. Similarly, the January 13, 2023, hearing transcript shows no discussion of this issue.

The trial court then partially amended its previous order to address the individual and class claims. As for the procedural due process claim, the trial court again noted the stipulated dismissal and went further, stating that the Thompsons "do not have a private right of action for money damages for a violation of provisions of the South Carolina Constitution, including Article I, § 3." Therefore, the trial court dismissed the Article I, § 3 claim on two grounds: (1) that the parties stipulated to its dismissal, and (2) that the remedy sought was monetary and thus impermissible.

The Thompsons only appealed the second ground, and the stipulated dismissal became the law of the case. Consequently, regardless of our decision on the issue raised, the claim must be dismissed. We therefore decline to reach the issue or address whether we should adopt the federal rule that procedural due process is only required for adjudications affecting individuals or small groups, not for legislation of general applicability. *Compare, e.g., Atkins v. Parker*, 472 U.S. 115, 129–130 (1985) (rejecting due process claim when general law reducing subsidy was enacted following the legislative process); *Bi-Metallic Inv. Co v. State Bd. Of Equalization*, 239 U.S. 441, 445–46 (1915) (finding that due process requires a hearing and an opportunity to be heard only when a "small number of persons was concerned"); *with Goldberg v. Kelly*, 397 U.S. 254, 269–70 (1970) (finding that a due process right to a fair hearing to contest an individual determination of ineligibility for subsistence benefits).

## VII.  Conclusion

In sum, we find the trial court properly dismissed the unjust enrichment, section 8-21-30, and Article I, § 3 claims. We also find that it erred in dismissing the declaratory judgment claim for lack of subject matter jurisdiction under the RPA. The ordinances here do not meet the definition of taxes under the RPA, so the RPA does not apply to bar subject matter jurisdiction for the individual or class claims. Further, the catchall provision of 12-60-80(C) does not prevent class actions against political subdivisions unless the claim concerns value-based property taxes, so it does not apply here. The trial court's decision is therefore

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**KITTREDGE, C.J., and FEW, J., concur.  HILL, J., concurring in part and dissenting in part in a separate opinion, in which JAMES, J., concurs.**

**JUSTICE HILL, concurring in part and dissenting in part:** I concur with Justice Verdin's well-written opinion for the majority, except for Section V. I respectfully dissent from the majority's conclusion that the South Carolina Tort Claims Act (SCTCA) restored sovereign immunity for equitable claims. In my view, to the extent South Carolina ever applied sovereign immunity to equitable claims, that immunity was abolished in *McCall* and has not been restored.

The precise origin and contours of the sovereign immunity doctrine, medieval in its mindset, are faint. Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 1-3 (1963). One theory is that it was built upon the idea that monarchs are above the law and may only be haled into court upon their consent. 14 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 3654 (4th ed. May 2025 update). Historically, English subjects could file petitions of right in chancery courts against their Sovereign to persuade him to consent to the equitable courts' authority. *Glidden Co. v. Zdanok*, 370 U.S. 530, 563 (1962); *Chisholm v. Georgia*, 2 U.S. 419, 442 (1793), *superseded on other grounds by constitutional amendment*, U.S. Const. amend. XI, *as recognized in Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97–98 (1984). Because "no wise Prince will ever refuse to stand to a lawful contract," sovereigns submitted to the jurisdiction of English courts by royal grace and the prod of practical wisdom, rather than the point of legal authority. *Chisholm*, 2 U.S. at 442 (quoting 1 William Blackstone, *Commentaries*, at 203).

Another take on the doctrine is that the phrase "the king can do no wrong" meant that the king could not let an injustice stand. In other words:

> [T]he requirement of consent was not based on a view that the King was above the law. "[T]he king, as the fountain of justice and equity, could not refuse to redress wrongs when petitioned to do so by his subjects." Indeed, it is argued by scholars on what seems adequate evidence that the expression "the King can do no wrong" originally meant precisely the contrary to what it later came to mean. "[I]t meant that the king must not, was not allowed, not entitled, to do wrong . . . ." It was on this basis that the King, though not suable in his court (since it seemed an anomaly to issue a writ against oneself), nevertheless endorsed on petitions "let justice be done," thus empowering his courts to proceed.

Jaffe, *supra*, at 3-4 (footnotes omitted).

There is considerable doubt as to whether sovereign immunity existed in South Carolina when it became a state. The historical record as to whether the early American states prevented suits against themselves in their own courts is inconclusive. *Alden v. Maine*, 527 U.S. 706, 762–69 (1999) (Souter, J., dissenting) (tracing history of sovereign immunity at time of founding and finding little proof that states enjoyed immunity from suit in their own courts). In fact, several states noted in their first constitutions that they could be sued. *Id*. at 769–72. To be sure, there are sweeping statements made by Alexander Hamilton and others that immunity from suit is inherent in a sovereign, but these statements are not backed up by any controlling authority.

But even if sovereign immunity has always existed in South Carolina, the doctrine would have retained the exceptions recognized by English law, including those that allowed equitable claims against the crown. South Carolina has long had a reception statute, which mandates that "All, and every part, of the common law of England, where it is not altered by the Code or inconsistent with the Constitution or laws of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section." S.C. Code Ann. § 14-1-50 (2017). As we have seen, since the time of Edward I, English subjects could sue the sovereign by way of the petition of right. Jaffe, *supra*, at 3. Importantly for our purposes here, "the petition of right did not extend to the field of torts." George W. Pugh, *Historical Approach to the Doctrine of Sovereign Immunity*, 13 La. L. Rev. 476, 479 (1953). English tribunals, such as Chancery and Exchequer, heard equity claims against the Crown. Jaffe, *supra*, at 6-7. It would be a monumental irony if the former colonists—having won independence from the tyrannies of the English crown—had by their victory gained as a spoil an absolute bar from suing their new government and deprived themselves of a basic freedom and legal remedy the crown guaranteed its subjects. This irony intensifies when we remember that South Carolina's 1778 constitution, echoing the Magna Carta, provided that one may not be "deprived of his life, liberty, or property, but by the judgment of his peers or by the law of the land." S.C. Const. art. XLI (1778).

Sovereign immunity clashes with the American ideal that all people are created equal. The Revolution was primed by resistance to the tyrannies of the king's absolute power, a resistance fueled by the rallying cry that, "[I]n America, the law is king." Thomas Paine, *Common Sense* (Philadelphia, R. Bell 1776); *see Langford v. United States*, 101 U.S. 341, 342–43 (1879) (declaring "the maxim of English constitutional law, that the king can do no wrong" does not "have any

place in our system of government" as "[w]e have no king to whom it can be applied"); *United States v. Lee*, 106 U.S. 196, 208–09 (1882) ("Under our system the *people*, who are there called *subjects*, are the sovereign . . . . When [a citizen], in one of the courts of competent jurisdiction, has established his right to property, there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right.").

The doctrine was adopted in the United States on more pragmatic grounds— protection of the government's policymaking function and treasury from "intolerable" litigation burdens. Wright and Miller, *supra*, at § 3654; Pugh, *supra*, at 477 n.8 (noting the burdens of appearing in court also drove the doctrine in England, for "if Henry III had been capable of being sued, 'he would have passed his life as a defendant'"). However, the doctrine deflates when it confronts a constitutional right, such as the prohibition against a government "taking" of private property without just compensation. S.C. Const. art. I, § 13. This Court held certain provisions of the constitution were a self-executed "consent" to suit, and the Legislature could expressly consent to suit on other grounds by statute. *Chick Springs Water Co. v. State Highway Dep't*, 159 S.C. 481, 493, 157 S.E. 842, 847 (1931), *overruled by McCall*, 285 S.C. at 247, 329 S.E.2d at 743; *Baker v. State Highway Dep't*, 166 S.C. 481, 487, 165 S.E. 197, 199 (1932), *overruled by McCall*, 285 S.C. at 247, 329 S.E.2d at 743. In the last century, this Court found the government could also consent to suit by implication, such as when it entered into lawful contracts. The Court, explained: "To hold otherwise would be to endorse an obvious contradiction, for it cannot be true that the State is empowered to contract with individuals and yet retains the power to avoid its obligations." *Kinsey Const. Co. v. S.C. Dep't of Mental Health*, 272 S.C. 168, 172, 249 S.E.2d 900, 903 (1978), *overruled on other grounds by McCall*, 285 S.C. at 243, 329 S.E.2d at 741 and *Unisys Corp. v. S.C. Budget & Control Bd. Div. of Gen. Servs. Info. Tech. Mgmt. Off.*, 346 S.C. 158, 551 S.E.2d 263 (2001).

Sovereign immunity was first mentioned by our courts in 1820. *Young v. Comm'rs of the Roads*, 11 S.C.L. (2 Nott & McC.) 537, 537–38 (1820). Forty years ago, this Court, after observing that "[s]overeign immunity can no longer by tolerated in this State," abolished it. *McCall*, 285 S.C. at 246–47, 329 S.E.2d at 742–43 ("Few principles of modern law have been so uniformly criticized [as the doctrine of sovereign immunity]."). In *McCall*, we overruled all previous South Carolina sovereign immunity cases "to the extent that they hold that an action may not be maintained against the State without its consent," subject to a few exceptions. *Id.* at 247, 329 S.E.2d at 743. *McCall* did away with the tortured

fiction that some implied consent to suit must be obtained from the State. But by limiting the contract exception from the SCTCA to pure breach of contract actions, the majority functionally revives the consent concept.

The SCTCA did not restore sovereign immunity as to anything other than certain tort liability. The SCTCA tells us that by its title. S.C. Code Ann. § 15-78-10 (2005) ("This chapter may be cited as the 'South Carolina Tort Claims Act'."). Its opening section announces that the "General Assembly in this chapter intends to grant the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability and suit for any tort except as waived by this chapter." S.C. Code Ann. § 15-78-20(b) (2005). Interpreting the SCTCA as fully restoring sovereign immunity breezes over the repeated references to "torts" and negligence pervading the SCTCA. The legislative findings of the SCTCA use some form of the word "tort" three times in its first paragraph. S.C. Code Ann. § 15-78-20(a) (2005). Equity is not mentioned. In *Murphy v. Richland Memorial Hospital*, when the Court stated the SCTCA "first completely restores sovereign immunity," it cited to § 15-78-20(b), which speaks only to immunity for tort causes of action. 317 S.C. 560, 563, 455 S.E.2d 688, 690 (1995).

The majority is correct that there is a difference between a contract implied in fact— that is, a contract where the elements of a legal contract are created by conduct rather than express words—and a contract implied by law. *Myrtle Beach Hosp. Inc.*, 341 S.C. at 8, 532 S.E.2d at 872; *see also Stanley Smith & Sons v. Limestone Coll.*, 283 S.C. 430, 433–35, 322 S.E.2d 474, 477–78 (Ct. App. 1984). But that distinction is of no moment in the world of sovereign immunity. The SCTCA, as the majority notes, states that "nothing" in the SCTCA "affects liability based on contract." S.C. Code Ann. § 15-78-20 (2005). The scope of what causes of action are "based on contract" does not rest upon or even nod to the distinction between the species of legal and equitable remedies that are based on contract principles. And it is telling that the decision the majority relies upon to promote this distinction was an unjust enrichment claim against a government. *Myrtle Beach Hosp. Inc.*, 341 S.C. at 7–10, 532 S.E.2d at 872–73. The decision does not mention the issue of sovereign immunity. *Id.*; *see also Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 582–84, 762 S.E.2d 696, 703–04 (2014) (discussing unjust enrichment claim brought against city without mentioning sovereign immunity).

The majority opinion holds that "the state maintains its sovereign immunity over any claims based on an implied contract, such as the unjust enrichment claim here." If the majority means that sovereign immunity barred all implied contract claims (i.e., both those implied by law and by fact), again I can find no authority to support this. One of our most cited cases is a pre-*McCall* implied contract claim that was allowed to proceed against a city, without a whisper about sovereign immunity. *Townes Assoc. Ltd. v. City of Greenville*, 266 S.C. 81, 84–88, 221 S.E.2d 773, 774–776 (1976), *abrogated in part on other grounds by Matter of Estate of Kay*, 423 S.C. 476, 481, 816 S.E.2d 542, 545 (2018).

Nowhere does the SCTCA even hint that its intent is to bar equitable claims against the State. To be sure, the SCTCA declares that "[a]ll other immunities applicable to a governmental entity, its employees, and agents are expressly preserved." § 15-78-20(b). But something that does not exist cannot be "preserved." In South Carolina, sovereign immunity was created by the courts (not the legislature), and this Court has abolished the doctrine. I can find no constitutional text, statute, or South Carolina appellate decision providing sovereign immunity is a bar to the equitable claims of our citizens.

Courts in several other states recognize that sovereign immunity does not extend to equitable causes of action. *See City of Cleveland v. Ohio Bureau of Workers' Comp.*, 152 N.E.3d 172, 174–75 (Ohio 2020) ("[T]he doctrine of sovereign immunity never barred equitable claims, which have always been cognizable against the state. . . ."); *State ex rel. Stephan v. Kansas House of Representatives*, 687 P.2d 622, 627 (Kan. 1984) ("[S]overeign immunity does not protect governmental entities from actions for equitable or extraordinary relief.").

The majority opinion closes the courthouse doors to citizens wronged by the state who have otherwise meritorious equitable claims. How far this lock-out extends to other non-tort claims is limited only by the legal imagination. In my view, the SCTCA only intended to limit liability for the "tortious sovereign." § 15-78-20(a). For these reasons, and with great respect, I dissent from Section V.

**JAMES, J., concurs.**